A.M.L. INTERNATIONAL, INC., et al., Plaintiffs,

v.

The Honorable William M. DALEY, United States Secretary of Commerce, Defendant.

No. Civ.A. 00–10241–EFH.

United States District Court, D. Massachusetts.

July 28, 2000.

---

Mary E. Kelleher, Mickelson, Barnet & Associates, P.C., New Bedford, MA, for plaintiffs.

Lisa Lynne Russell, U.S. Department of Justice, Environment & Natural Re-sources Division, Washington, DC, for defendant.

## MEMORANDUM AND ORDER

HARRINGTON, District Judge.

### I. *Introduction*

The fishing industry is, and has always been, an extremely important part of this nation's heritage. The United States is the world's fifth largest fishing nation, harvesting approximately ten billion pounds of fish, and producing approximately $3.5 billion in dockside revenues each year. The United States is the third largest seafood exporter, with exports valued at over $3 billion annually.[1]

This case concerns the spiny dogfish, a small shark whose habitat extends from Nova Scotia to Florida. The vast majority of the spiny dogfish fishing industry, however, exists in the New England and mid-Atlantic waters. The directed fishery of the spiny dogfish has emerged only within the last fifteen years.[2] During this time, commercial landings have increased approximately ten-fold. Since 1990, the United States fishing industry has landed and processed an average of forty (40) million pounds of spiny dogfish each year. Indeed, in 1999, more than forty (40) percent of all fish caught by weight in the Northwest Atlantic were spiny dogfish.

The plaintiffs in this case are New England and mid-Atlantic companies which harvest, process and export spiny dogfish. The plaintiffs constitute the vast majority of the spiny dogfish fishing and processing industry. Last year, the plaintiffs processed over forty (40) million pounds, and generated revenues in excess of $20 million from sales of spiny dogfish. Additionally, the plaintiffs represent many individuals

---

1. *See, e.g., Reauthorization of the Magnuson–Stevens Act: Hearings Before the Senate Subcommittee on Oceans and Fisheries of the Senate Committee on Commerce, Science, and Transportation,* 1999 WL 20010880 (July 29, 1999) (statement of Penelope Dalton, Assis-tant Administrator of the National Marine Fisheries Service of the United States Department of Commerce).

2. A directed fishery is essentially fishing effort which targets a specific type of fish.

whose livelihood depends on the harvest, processing and sale of spiny dogfish.

This dispute arose when the Secretary of the United States Department of Commerce ("the Secretary"), through the National Marine Fisheries Service ("NMFS"), imposed regulatory restrictions through the implementation of the spiny dogfish Fishery Management Plan ("SDFMP") on the spiny dogfish fishing industry. The Secretary acknowledges that the quota restrictions contained in the plan will likely have the effect of shutting down the spiny dogfish industry for at least the next five years. *See* Final Rule, 65 Fed.Reg. 1557, 1566–67 (January 11, 2000).

The plaintiffs bring this case, therefore, seeking to invalidate the SDFMP. The plaintiffs argue that the actions of the Secretary were arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law. This Court is now faced with the weighty task of either declaring the plan invalid as a matter of law, or upholding the actions of the Secretary. This Court is well aware that the latter decision may well cause the collapse of the spiny dogfish fishing and processing industry.[3]

## II *Statutory Framework*

In 1976, Congress passed the Fishery Conservation and Management Act ("the Magnuson–Stevens Act") in order to preserve our fishery resources by creating a national exclusive economic zone which extends two hundred (200) miles from the United States coast. *See* 16 U.S.C. § 1801 *et seq* ; *see also Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 107 (1st Cir.1997). The Magnuson–Stevens Act, additionally, establishes a national program for the conservation and management of fishery resources "in order to prevent overfishing, to rebuild overfished

stocks, to insure conservation, to facilitate long-term protection of essential fish habitats, and to realize the full potential of the nation's fishery resources." *See* 16 U.S.C. § 1801(a)(6).

To allow broad-based participation in the management process, the Magnuson–Stevens Act created eight regional fishery management councils composed of state fishery managers, the regional NMFS fisheries administrator, and qualified fishing industry, academic, and environmental representatives. *See* 16 U.S.C. § 1852(a)(1). Each council has authority over the fisheries seaward of the states comprising it. *See id.* The primary responsibility of the councils is the development of fishery management plans that establish the rules for each fishery and meet national conservation and management standards established in the Magnuson–Stevens Act. *See* 16 U.S.C. § 1852(h).

In 1996, Congress ushered in a new era in fisheries management by making significant revisions to the Magnuson–Stevens Act through the Sustainable Fisheries Act. *See* Pub.L. No. 104–297, 110 Stat. 3559 (1996). The Magnuson–Stevens act was revised because, "it was very clear that major changes were needed. Despite numerous efforts to improve the law over the past two decades, the sad reality [was] that the act did not prevent the current crisis in . . . groundfish stocks, a crisis for the conservation of both fish stocks and fishing families." *See* 142 Cong.Rec. H11418, 11439 (September 27, 1996) (statement of Rep. Studds). Indeed, Congress recognized that revisions to the Magnuson–Stevens act were critical in order to "put our fisheries back onto a sustainable path and literally avert an environmental catastrophe on a national level. . . . We are precariously close to fisheries failures in

---

**3.** The administrative record establishes that certain fishing communities are very dependent on the spiny dogfish. In Plymouth, Massachusetts, for example, spiny dogfish landings account for ninety-six (96) percent of total pounds and seventy-four (74) percent of the total value of all fish landed. In Scituate, Massachusetts, spiny dogfish landings account for seventy-four (74) percent of total pounds and twenty-one (21) percent of the total value of all fish landed. *See* Final Rule, 65 Fed.Reg. 1557, 1564 (January 11, 2000).

many of our most commercially important fish stocks, and it is imperative that we take immediate action if we are to avert disasters." *See* 142 Cong.Rec. S10794, 10811–12 (September 18, 1996) (statement of Sen. Kerry).

■ Perhaps the most significant revision to the Magnuson–Stevens Act was the removal of some discretion regarding "overfished" fisheries.[4] If the Secretary determines at any time that a fishery is overfished, the Secretary must immediately notify the appropriate fishery council, and request that action be taken to end overfishing in the fishery and to implement conservation and management measures to rebuild affected stocks of fish. *See* 16 U.S.C. § 1854(e)(2); 50 C.F.R. § 600.310(e)(2). Once a council has been notified that a particular stock is overfished, it has only one year to prepare a fishery management plan to end overfishing and rebuild the stocks.[5] *See* 16 U.S.C. § 1854(e)(3); 50 C.F.R. § 600.310(e)(3). The primary purpose of a plan is to establish conservation and management measures which are "necessary and appropriate for the conservation and management

of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." *See* 16 U.S.C. § 1853(a)(1)(A). The ultimate goal, therefore, of any fishery management plan is to establish measures which achieve a rate or level of fishing mortality that allows the fishery to produce the maximum sustainable yield on a continuing basis.[6] *See* 16 U.S.C. § 1802(29); 50 C.F.R. § 600.310(a)

After a council submits a fishery management plan to the Secretary, the Secretary is required to immediately review the plan to ensure that it is consistent with ten "National Standards" and other provisions of the Magnuson–Stevens Act as well as any other applicable law. *See* 16 U.S.C. §§ 1851(a)(1)–(10), 1854(a)(1); 50 C.F.R. §§ 600.310–600.355. After a fishery management plan is submitted, the Secretary must accept public comment for sixty days. *See* 16 U.S.C. § 1854(a)(1)(B). Within thirty days of the end of the public comment period, the Secretary must approve, disapprove or partially approve the plan. *See* 16 U.S.C. § 1854(a)(3).

---

**4.** The Magnuson–Stevens Act defines overfishing as "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." *See* 16 U.S.C. § 1802(29); 50 C.F.R. § 600.310(d)(1)(i). Maximum Sustainable Yield ("MSY") is the "largest long-term average catch or yield that can be taken from a stock under prevailing ecological and environmental conditions." *See* 50 C.F.R. § 600.310(c)(1)(i).

**5.** Significantly, Congress imposed the one-year time limit on fishery councils because of the perceived inability of fishery councils to quickly enact needed conservation measures. Indeed, Congress recognized that "it actually took a lawsuit by two Massachusetts environmental groups to force the notoriously slow New England Fishery Management council to draft and implement a fishery management plan that contained the teeth needed to stem continued overfishing and stock decimation." *See* 142 Cong.Rec. S10906, 10910 (September 19, 1996) (statement of Sen. Chafee).

**6.** The Magnuson–Stevens Act requires that fishery management plans must ultimately

"prevent overfishing." *See* 16 U.S.C. § 1853(a)(1)(A). As discussed above, "overfishing" means a rate of mortality that jeopardizes the capacity of a fishery to produce MSY on a continuing basis. *See* 16 U.S.C. § 1802(29); 50 C.F.R. § 600.310(d)(1)(i). The Magnuson–Stevens Act also calls for fishery management plans to specify the "optimum yield." *See* 16 U.S.C. §§ 1853(a)(3), (4). The statute defines "optimum yield" as the amount of fish which will provide the greatest overall benefit to the nation, with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems. *See* 16 U.S.C. § 1802(28)(A); 50 C.F.R. § 600.10. Optimum yield is prescribed on the basis of the MSY from the fishery, as reduced by any relevant social, economic, or ecological factor. *See* 16 U.S.C. § 1802(28)(B); 50 C.F.R. § 600.10. More importantly, the optimum yield for an overfished fishery *must rebuild to a level consistent with producing the maximum sustainable yield.* *See* 16 U.S.C. § 1802(28)(C); 50 C.F.R. § 600.10.

Finally, if the Secretary determines that an emergency exists, or that interim measures are needed to reduce overfishing, he may promulgate such interim measures necessary to address the emergency, whether or not a fishery management plan exists. *See* 16 U.S.C. § 1855(c)(1); 50 C.F.R. § 600.310(e)(5). An interim measure is treated as an amendment to a fishery plan for the period it is in effect. *See* 16 U.S.C. § 1855(c)(3). The Secretary is not required to accept public comment when implementing interim measures in exceptional circumstances.[7] *See* 50 C.F.R. § 600.310(e)(5)(ii).

### III. *Administrative Background*

On April 3, 1998, the Secretary designated the spiny dogfish as "overfished." *See* Notification of an Overfished Fishery, 63 Fed.Reg. 17820 (April 10, 1998); *see also* 16 U.S.C. § 1854(e)(2); 50 C.F.R. § 600.310(e)(2). Joint management responsibility was given to the New England Fisheries Management Council ("NEFMC") and the Mid–Atlantic Fisheries Management Council ("MAFMC").[8] Over the course of the following year, the NEFMC and the MAFMC developed a fishery plan for the spiny dogfish which proposed management measures to control fishing mortality, contained a definition of overfishing, set forth a five (5) year stock

rebuilding schedule, and identified and described the essential fish habitat. *See* Notice of Availability of Fishery Management Plan and Request for Comment, 64 Fed. Reg. 34759 (June 29, 1999). Public comment on the SDFMP ended on August 30, 1999.[9] On September 29, 1999, the Secretary partially approved the SDFMP.[10]

On January 11, 2000, the Secretary published the final SDFMP and regulatory measures contained therein. *See* Final Rule, 65 Fed.Reg. 1557 (January 11, 2000). The Secretary determined that the SDFMP, except for the disapproved measure, was necessary for the conservation and management of the spiny dogfish fishery, and that it was consistent with the Magnuson–Stevens Act and other applicable laws. *See id.* at 1565. Importantly, one of the measures implemented by the SDFMP was a commercial quota to be specified annually and allocated semi-annually. *See id.* at 1558. The SDFMP anticipated a one-year "exit fishery" with a quota of twenty-two (22) million pounds from May 1, 1999 through April 30, 2000. Each year thereafter, the councils are required to recommend quotas and trip-limits to achieve the rebuilding objectives of the SDFMP. *See id.* at 1570. The SDFMP contains a projected quota for year two, beginning May 1, 2000, of 2.9 million

**7.** This Court discusses this issue at greater length in Part VI(E) of this opinion.

**8.** The NEFMC consists of members from the states of Maine, New Hampshire, Massachusetts, Rhode Island and Connecticut. The MAFMC consists of members of the states of New York, New Jersey, Delaware, Pennsylvania, Maryland, Virginia and North Carolina. Each council has authority over the fisheries in the Atlantic Ocean seaward of such states. *See* 16 U.S.C. § 1852(a)(1)(A)–(H).

**9.** Approximately 124 comments were received during the sixty day public comment period. The administrative record indicates that most of the comments were "overwhelmingly in support of" the overall SDFMP (121 of 124 comments). It also indicates, however, that most of the comments were *not* supportive of the 180,000 metric tons Spawning Stock Bio-

mass ("SSB") target. *See* Final Rule, 65 Fed. Reg. 1557, 1560 (January 11, 2000); *see also* Letter to Penelope Dalton, Administrative Record at 3121 (September 27, 1999). The SSB target is discussed at great length in Parts VI(A)–(B) of this opinion.

**10.** Specifically, the Secretary disapproved the portion of the SDFMP which set a rebuilding target for SSB at 180,000 metric tons. The plaintiffs note, after the measure was disapproved, that the NEFMC voted (9–6) to withdraw its support for the SDFMP. This is of no legal consequence to the validity of the SDFMP. When the SDFMP was submitted to the Secretary, it had been approved by both councils. In order to legally amend the SDFMP, both councils must vote for and submit a joint amendment, or conduct a framework adjustment process. *See* 16 U.S.C. § 1854(f).

pounds. This projected quota anticipates that the fishing mortality rate will be reduced to 0.03 for at least the next three years of the rebuilding plan. *See id.* at 1558.

This final rule implementing the SDFMP was scheduled to become effective on February 10, 2000. The Secretary, however, *three times* delayed the effective date of the final rule in order to provide the councils with an opportunity to agree on quotas, trip limits, and a revised SSB target. *See* Final Rule Delay of Effectiveness, 65 Fed.Reg. 16844 (March 30, 2000). The final rule implementing the SDFMP became effective on April 3, 2000.

On May 1, 2000, the councils had *still* not agreed on quotas or trip limits necessary to implement the SDFMP. On May 4, 2000, therefore, the Secretary implemented an interim final rule which, acting as an amendment to the SDFMP, establishes such quotas and trip limits. *See* Interim Final Rule, 65 Fed.Reg. 25887 (May 4, 2000). The interim final rule establishes a total quota for year two of the SDFMP of 4.5 million pounds, and trip limits of 600 pounds for the first six months and 300 pounds for the second six months.[11] *See id.* at 25888–89.

On February 8, 2000, the plaintiffs commenced this action against the Secretary. On June 20, 2000, this Court held a lengthy hearing on the issues herein.

### IV. *Summary of Plaintiffs' Claims*

The plaintiffs in this case argue that both the January 11, 2000 final rule implementing the SDFMP, and the May 4, 2000 interim final rule establishing quotas and trip limits fail to comply with the Magnuson–Stevens Act, certain National Standards, and the Regulatory Flexibility Act.

The plaintiffs argue that it was contrary to the Magnuson–Stevens Act for the Sec-

retary to implement an SDFMP and interim final rule which (1) failed to contain an overfishing definition, (2) failed to contain a biomass target associated with maximum sustainable yield, (3) failed to contain a meaningful rebuilding period, (4) failed to contain measures necessary and appropriate to end overfishing or rebuild, and (5) failed to minimize bycatch.

The plaintiffs also argue that the final rule implementing the SDFMP and the interim final rule are inconsistent with certain National Standards set forth in the Magnuson–Stevens Act. *See* 16 U.S.C. §§ 1851(a), 1853(a)(1)(C). Specifically, the plaintiffs argue that the implementation of the SDFMP and the interim final rule violate National Standards One, Two, Five, Eight and Nine. *See* 16 U.S.C. §§ 1851(a)(1), (2), (5), (8), (9); *see also* 50 C.F.R. §§ 600.310(a), 600.315, 600.330, 600.345, 600.350.

Finally, the plaintiffs argue that the implementation of the interim final rule violates public notice and comment requirements, as well the Regulatory Flexibility Act, 5 U.S.C. § 601, *et. seq.*

### V. *Standard of Review*

▆ The Magnuson–Stevens Act and the Regulatory Flexibility Act each provide for judicial review of the Secretary's actions pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. § 701, *et seq.* Under the standard of review established by the APA, this Court may set aside an administrative action only if that action is arbitrary, capricious or otherwise contrary to law. *See* 5 U.S.C. § 706(2)(A)–(D); *see also Sierra Club v. Marsh,* 976 F.2d 763, 769 (1st Cir.1992) (citing *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 375, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)). Under the APA, administra-

---

**11.** In response to suggestions, approximately 500,000 pounds of the total quota is set-aside to be used for experimental fishery programs. The primary goal in providing this incentive is to determine if it is feasible to sustain a di-

rected fishery by shifting fishing effort away from female spiny dogfish. *See* Interim Final Rule, 65 Fed.Reg. 25887, 25888 (May 4, 2000).

tive actions are to be presumed valid and afforded great deference. *See Associated Fisheries,* 127 F.3d at 109. This Court must uphold the decision of the Secretary, therefore, if the regulations were passed pursuant to statute, reasoned and supported by substantial evidence in the record. *See id.*

The task of a court reviewing agency action under the APA "arbitrary and capricious" standard is to determine whether the agency has examined the pertinent evidence, considered the relevant factors, and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. *See Penobscot Air Services, Ltd. v. Federal Aviation Administration,* 164 F.3d 713, 719 (1st Cir.1999) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result and respond to relevant and significant public comments. *See id.* n. 3. This Court, therefore, must consider whether the Secretary's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *See id.* at 720 n. 4 (citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).

Furthermore, this Court must undertake a "thorough, probing, in-depth review" and a "searching and careful" inquiry into the administrative record. *See Penobscot Air,* 164 F.3d at 720. In order for an agency decision to pass muster under the "arbitrary and capricious" test, this Court must determine that the decision is "rational" and that it "makes sense." *See id.* In other words, this Court must carefully review the record and be satisfied that the Secretary has made a reasoned decision founded on a reasoned evaluation of the relevant factors. *See id.*

"An agency rule is arbitrary and capricious if the agency lacks a rational basis for adopting it—for example, if the agency relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise." *Associated Fisheries,* 127 F.3d at 109. Finally, so long as the Secretary's determination is "within the bounds of reasoned decisionmaking," this Court may not set it aside, regardless of whether it would have reached the opposite decision. *See M/V Cape Ann v. United States,* 199 F.3d 61, 63–64 (1st Cir. 1999).

## VI. *Discussion*

The plaintiffs argue that the implementation of the SDFMP was arbitrary, capricious or otherwise contrary to the law because the SDFMP failed to contain certain provisions required by the Magnuson–Stevens Act.

### A. *Overfishing Definition*

The plaintiffs argue that the SDFMP is violative of the Magnuson–Stevens Act because it does not contain a definition of overfishing. Specifically, the Magnuson–Stevens Act requires all fishery management plans to "specify objective and measurable criteria for identifying when the fishery to which the plan applies is overfished (with an analysis of how the criteria were determined and the relationship of the criteria to the reproductive potential of stocks of fish in that fishery) and, in the case of a fishery which ... the Secretary has determined ... is overfished, contain conservation measures to prevent overfishing or end overfishing and rebuild the fishery." *See* 16 U.S.C. § 1853(a)(10); 50 C.F.R. § 600.310(d)(2). The Magnuson–Stevens Act defines "overfishing" as the rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a con-

tinuing basis. *See* 16 U.S.C. § 1802(29); 50 C.F.R. § 600.310(d)(1)(i).

When the councils first submitted the SDFMP to the Secretary, it contained at least two objective and measurable criteria that enabled the councils and the Secretary to determine annually whether the fishery is overfished. *See* 50 C.F.R. § 600.310(d)(2). A fishery plan must specify, *to the extent possible*, (1) a maximum fishing mortality threshold, and (2) a minimum stock size threshold, or reasonable proxies thereof. *See* 50 C.F.R. §§ 600.310(d)(2)(i)–(ii). The SDFMP, as submitted, contained both, as well as a fishing mortality target and a minimum stock size target.[12] The SDFMP originally proposed a target fishing mortality rate of 0.03, which was designed to achieve a target Spawning Stock Biomass ("SSB") of 180,000 metric tons within five (5) years.[13] The Secretary, however, disapproved the SSB target, leaving the plan with only the SSB threshold and the fishing mortality threshold and target.

### 1. *Disapproval of the SSB Rebuilding Target*

The primary purpose of a rebuilding program for overfished stock is to rebuild the stock to produce MSY on a continuing basis.[14] *See* 16 U.S.C. §§ 1853(a)(1)(A), 1853(a)(10), 1802(29), 1802(28)(C); 50 C.F.R. § 600.310. When data are insufficient to estimate MSY directly, however, councils and the Secretary may adopt other measures of productive capacity that can serve as a reasonable proxy for MSY. *See* 50 C.F.R. § 600.310(c)(3). In this case, the councils and the Secretary have chosen to use the maximum Spawning Stock Biomass ("SSBmax") as a scientifically acceptable proxy for MSY.

In this case, the administrative record is crystal clear that the best scientific information available at the time indicated that SSBmax for the spiny dogfish fishery was 200,000 metric tons.[15] The spiny dogfish Technical Committee of the NEFMC and

12. The minimum stock size threshold is specified as one half (½) the MSY stock size or suitable proxy. *See* 50 C.F.R. § 600.310(d)(2)(ii). Originally, SSBmax was estimated at 200,000 metric tons. One half of SSBmax is 100,000 metric tons. The minimum stock size threshold was not disapproved by the Secretary. The maximum fishing mortality threshold must not exceed the fishing mortality rate associated with obtaining the MSY. *See* 50 C.F.R. § 600.310(d)(2)(i). In this case, the maximum fishing mortality threshold is currently estimated to be 0.11.

13. Spawning Stock Biomass ("SSB") is the amount of mature, reproductive fish in a given fishery. In this case, SSB refers to large, mature, female spiny dogfish. Dogfish landings are primarily composed of females because they attain a larger size than males, and large fish are preferred by the processing sector. *See* Final Rule, 65 Fed.Reg. 1557, 1558 (January 11, 2000). Since 1989, however, *biomass estimates of mature females have declined by over fifty (50) percent. See id.*

14. As discussed above, MSY is the largest long term average catch or yield that can be taken from a stock or stock complex under prevailing ecological and environmental conditions. *See* 50 C.F.R. 600.310(c)(1).

15. The record indicates that recent *preliminary* data estimates that SSBmax is actually only 167,000 metric tons. *See* Dogfish Technical Committee Minutes, Administrative Record at 348 (March 6, 2000). This data is the result of re-calibrating a nineteen (19) percent increase in the previous area surveyed. The effect of increasing the amount of area surveyed is to proportionately reduce the biomass estimates.

First of all, it is important to note that this recent data is a preliminary number which has not undergone any peer review. More importantly, *while the value for SSBmax may be smaller, the estimates of current and historical biomass are also reduced proportionately. See id.* Under these recent projections, the current level of SSB represents only twenty-nine (29) percent of the 167,000 metric tons target, while under the previous projections, the current level of SSB represented sixty-four (64) percent of the 200,000 metric tons target. *See id.* at 349. The new estimates, therefore, are a double-edged sword which *"even more emphasize the increased mortality rates and lower stock size." See* Administrative Record at 350 (emphasis added). Based upon this new information, the councils have since supported the new SSBmax target of 167,000.

the MAFMC determined that SSBmax was 200,000 metric tons. This proposal was reviewed and accepted by the Overfishing Definition Review Panel, which consists of a group of scientists from the councils, NMFS, and academia. The councils' Joint Scientific and Statistical Committee also verified that 200,000 metric tons was the proper SSBmax. Furthermore, the NMFS Northeast Fisheries Science Center determined that 200,000 metric tons was the proper SSBmax. Finally, there were one hundred twenty-two (122) written public comments which requested NMFS to reject the SSB rebuilding target of 180,000 metric tons in the proposed SDFMP. These comments noted their support for the rebuilding target of 200,-000 metric tons, or SSBmax. *See* Final Rule, 65 Fed.Reg. 1557, 1560 (January 11, 2000).

It is clear from the record, including council meeting transcripts, that the original proposal of 180,000 metric tons was a *compromise* measure proposed by the NEFMC, and contrary to the best scientific evidence available at the time. The Secretary acted pursuant to the Magnuson–Stevens Act when he disapproved the SSB target of 180,000 metric tons included in the proposed SDFMP. Indeed, the Secretary would have been in direct violation of the Magnuson–Stevens Act if he had approved a SDFMP which provided for a rebuilding target *less* than SSBmax, the proxy for MSY.

Some members of the NEFMC and state agencies seem to be of the opinion that the SDFMP may designate an SSB target which is only ninety (90) percent of SSBmax. *This is not so.* Conservation and management measures for any fishery which has been designated as "overfished" *must* provide for rebuilding to a level consistent with producing the MSY in such fishery. *See* 16 U.S.C. §§ 1802(28)(C), 1802(29); 50 C.F.R. § 600.310. In this case, the best available science has determined that a proper proxy for MSY is SSBmax. *Therefore, the SDFMP must provide for rebuilding measures which will achieve and sustain SSBmax within a time period as short as possible but not exceeding ten (10) years.*[16] As required by the Magnuson–Stevens Act, the Secretary properly disapproved the 180,000 metric tons target.

## 2. *The Remaining Definition of Overfishing*

After the Secretary partially disapproved the proposed SSB target in the SDFMP, the remaining objective and measurable criteria by which overfishing can be identified are the maximum fishing mortality threshold and target, as well as the minimum stock size threshold. The target fishing mortality established by the SDFMP is approximately 0.03 for at least the first three years of the rebuilding period. At the time the Secretary approved the SDFMP, the scientific evidence supported the conclusion that this rate was consistent with achieving SSBmax within a ten (10) year rebuilding period.[17]

The remaining definition of overfishing contained in the SDFMP was not rendered inadequate when the Secretary disapproved the 180,000 metric tons target SSB. The SDFMP, according to the best scientific information at the time, clearly indicated that SSBmax was 200,000 metric tons. The Magnuson–Stevens Act clearly states that a fishery is overfished when the rate

---

**16.** Recent data indicates that, even if a mortality of 0.03 were achieved, it would take longer than ten (10) years to achieve SSBmax. This, however, does not cause the plan to violate the Magnuson–Stevens Act because the plan still calls for a rebuilding time period which is "as short as possible." In this case, the ten (10) year rebuilding limit is exceeded only because the "the biology of the stock of fish [and] other environmental conditions ... dictate otherwise." *See* 16 U.S.C. § 1854(e)(4).

**17.** Recent data indicates that at the target mortality rate of 0.03, it may actually take closer to fifteen years to rebuild the fishery to SSBmax. *See* Spiny Dogfish Technical Committee, Administrative Record at 499 (March 24, 2000).

of mortality jeopardizes the capacity of the fishery to produce MSY on a continuing basis. Despite the fact that there is currently no SSB target contained in the SDFMP, there are still objective and measurable criteria which identify overfishing.[18]

Finally, common sense dictates that a fishery management plan can not be rendered invalid merely because the Secretary partially disapproves measures which are wholly violative of the Magnuson–Stevens Act. The plaintiffs would have this Court invalidate a fishery management plan because the councils submitted a plan which contained a flawed rebuilding target. This interpretation would render meaningless the power of the Secretary to partially disapprove a fishery management plan. *See* 16 U.S.C. § 1854(a)(3). In this case, the Secretary partially approved the SDFMP which contains measures essential to rebuild and prevent the overfishing of the spiny dogfish.

Given the broad, remedial nature of the Magnuson–Stevens Act, it is illogical to invalidate the SDFMP, or any fishery management plan, simply because the Secretary partially disapproves a rebuilding target which *itself* violates the requirements of the Magnuson–Stevens Act.

### B. *Lack of Biomass Target, Rebuilding Period and Management Measures*

■ The plaintiffs next argue that the implementation of the SDFMP by the Secretary was arbitrary, capricious or otherwise contrary to the law because it no longer contains an SSB target associated with MSY, a meaningful rebuilding period, or measures necessary to prevent overfishing. The Magnuson–Stevens Act requires a fisheries management plan to contain

management measures necessary to prevent overfishing. *See* 16 U.S.C. § 1853(a)(10). As discussed above, it is eminently clear from a thorough review of the administrative record, that the scientific evidence at the time established that SSBmax for the spiny dogfish was 200,000 metric tons. The SDFMP establishes a fishing mortality target of 0.03, which the record and scientific evidence at the time projected would achieve SSBmax within the ten (10) year rebuilding period required by the Magnuson–Stevens Act. *See* 16 U.S.C. § 1854(e)(4)(A).

The remaining management measures contained in the SDFMP, and the quotas and trip limits established by the interim final rule, are consistent with achieving SSBmax and the stated purpose of the Magnuson–Stevens Act. Furthermore, the Secretary was more than patient with the councils after he disapproved the SSB rebuilding target of 180,000 metric tons. The councils are required by law to propose a fishery management plan consistent with the Magnuson–Stevens Act within one year. *See* 16 U.S.C. § 1854(e)(3). The Secretary *three times* delayed the implementation of the final rule in order for the councils to submit quotas, trip limits and a new rebuilding target consistent with SSBmax.

At this point, not only is the Secretary well within the bounds of the law to propose his own amendment to the SDFMP, but the Magnuson–Stevens Act *requires* him to prepare his own amendment if the councils have not submitted a conforming plan within one year from the date of notification. *See* 16 U.S.C. §§ 1854(c), (e)(5); *see also Conservation Law Foundation of New England, Inc. v. Franklin,* 989 F.2d 54, 60 (1st Cir.1993) (the Secretary may generate his own revisions to

---

18. For instance, the SDFMP establishes a target fishing mortality of 0.03 for at least the first three years of the remaining rebuilding period, and a threshold mortality of 0.11. The SDFMP also explicitly states, based on prior scientific data, that the proper SSBmax

was 200,000 metric tons. The councils, at the time, did not dispute this number, but rather, proposed a target SSB which was ninety (90) percent of SSBmax. *See* Final Rule, 65 Fed. Reg. 1557, 1558 (January 11, 2000).

council generated plans if the council fails to revise them within a reasonable time).

Again, it is illogical to invalidate an entire fishery management plan on account of the very fact that the Secretary partially disapproved measures which violated the Magnuson–Stevens Act. Not only was it reasonable for the Secretary to partially approve the remaining measures of the SDFMP, but he was legally required to do so in order to comply with the time frames established by the Magnuson–Stevens Act. See 16 U.S.C. § 1854(a).

### C. National Standards

#### 1. National Standard One (Overfishing and Optimum Yield)

The plaintiffs argue that the SDFMP and the interim final rule fail to comply with National Standard One ("NS–1"). NS–1 requires that conservation and management measures prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery. See 16 U.S.C. § 1851(a)(1); 50 C.F.R. § 600.310. Optimum yield, as discussed above, is the amount of fish which, in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield. See 16 U.S.C. § 1802(28)(C); 50 C.F.R. § 600.10. As already noted, there is no question that the Secretary reasonably concluded that the SDFMP and the interim final rule meet this standard.

The plaintiffs argue that the SDFMP cannot result in rebuilding the stock to produce a maximum sustainable yield because no rebuilding target has been determined which will result in the maximum sustainable yield. In effect, the plaintiffs argue that the SDFMP and the interim final rule violate NS–1 by failing to have a proper definition of overfishing. This argument has been addressed by this Court in its discussion above. See supra Part

19. The term "bycatch" means fish which are harvested in a fishery, but which are not sold or kept for personal use, and includes economic discards and regulatory discards. By-

VI(A) of this opinion. The determination of optimum yield in the SDFMP is more than reasonably supported by evidence in the administrative record.

#### 2. National Standard Two (Best Scientific Information)

National Standard Two ("NS–2") requires that conservation and management measures be based upon the best scientific information available. See 16 U.S.C. § 1851(a)(2); 50 C.F.R. § 600.315. The plaintiffs argue, for example, that (1) the MSY could not be reliably estimated, (2) mortality rates are poorly known, (3) there is no data for biomass estimates prior to 1990, (4) the SDFMP did not fully account for discard and bycatch information, and (5) the councils' recommended quotas and trip limits were extremely divergent.[19]

The fact that scientific information is incomplete, however, does not prevent the implementation of a fishery management plan. See 50 C.F.R. § 600.315(b); see also Commonwealth of Massachusetts v. Daley, 10 F.Supp.2d 74, 77 (D.Mass.1998). Furthermore, the use of a proxy for MSY is scientifically acceptable and specifically allowed under the guidelines. See 50 C.F.R. § 600.310(c)(3), (d)(3)(i). The guidelines specifically state that, "when data are insufficient to estimate MSY, councils should base status determination criteria on reasonable proxies thereof to the extent possible." See 50 C.F.R. § 600.310(d)(3)(i).

As discussed above, three separate scientific committees involved with the preparation of the SDFMP recommended and approved the use of optimum spawning stock biomass ("SSBmax") as a suitable proxy for MSY. Furthermore, NMFS used data from 1970 through 1997 to determine the stock recruitment function and SSBmax. See Final Rule, 65 Fed.Reg. 1557, 1562 (January 11, 2000). Even if the

catch generally does not include fish which are released alive. See 16 U.S.C. § 1802(2); 50 C.F.R. 600.350(c).

Secretary had been faced with conflicting scientific evidence, his decision cannot be termed arbitrary or capricious. *See Associated Fisheries,* 127 F.3d at 110. Indeed, a reviewing court must afford special deference to an agency's scientific expertise. *See id.*

Furthermore, the fact that the NEFMC subsequently recommended a quota of twenty-two (22) million pounds is of no consequence to a determination of scientific reliability. The administrative record clearly indicates that a projected annual quota of approximately 2.9 million pounds is needed in order to achieve the annual target fishing mortality of 0.03. *See* Final Rule, 65 Fed.Reg. 1557, 1558. In any event, it appears evident from the record that the NEFMC subsequently withdrew support for the SDFMP only after their "compromise" target SSB was disapproved by the Secretary.

Finally, the Secretary believes that the level of bycatch and discards estimated by the plaintiffs is far greater than projections provided by NMFS sampling data. The record does not indicate that the Secretary failed to fully account for discard and bycatch information.[20] The Secretary's approval and implementation of the SDFMP was based upon the best scientific information available, and in no way violated NS–2. *See* 16 U.S.C. § 1851(a)(2); 50 C.F.R. § 600.315.

### 3. *National Standard Five (Efficiency)*

■ National Standard Five ("NS–5") provides that conservation and management measures, where practicable, consider "efficiency in the utilization of fishery resources—except that no measure shall have economic allocation as its sole purpose." *See* 16 U.S.C. § 1851(a)(5). An efficient fishery harvests an optimum yield with a minimum use of economic inputs such as labor, capital, interest and fuel. *See* 50 C.F.R. § 600.330(b)(2). In other words, given a set of objectives for the fishery, a fishery management plan should contain management measures that result in an efficient fishery. *See* 50 C.F.R. § 600.330(b).

The objective for this overfished fishery, as discussed above, is to rebuild it to a level consistent with producing MSY, or in this case, achieving SSBmax. The measures and quotas implemented pursuant to the SDFMP seek to achieve this objective by essentially reducing the fishery to a "bycatch-only" fishery. In essence, by eliminating the directed fishery, there will be no labor, capital or fuel associated with the direct harvest of spiny dogfish. Finally, the projected levels of bycatch do not make inefficient the SDFMP or the measures contained therein. The administrative record indicates that the Secretary has considered efficiency in the utilization of fishery resources.

The SDFMP contains management measures which result in an efficient fishery. The Secretary properly considered efficiency, and did not violate NS–5. *See* 16 U.S.C. § 1851(a)(5); 50 C.F.R. § 600.330.

### 4. *National Standard Eight (Adverse Economic Impacts)*

■ National Standard Eight ("NS–8") states that "conservation and management measures shall, *consistent with the conservation requirements of this Act* (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) *to the extent practicable,* minimize adverse economic impacts on such communities." *See* 16 U.S.C. § 1851(8); 50 C.F.R. § 600.345(a) (emphasis added).

NS–8 explicitly acknowledges that deliberations regarding the importance of fishery resources to affected fishing com-

---

**20.** This Court provides a more thorough discussion on the issue of bycatch and discard in its analysis regarding National Standard Nine and 16 U.S.C. 1853(11). *See infra* Part VI(C)(5).

munities *"must not compromise the achievement of conservation requirements." See* 50 C.F.R. § 600.345(b) (emphasis added). All other things being equal, however, where two alternatives achieve similar conservation goals, the alternative which provides the greater potential for sustained participation of communities and minimizes the adverse economic impacts is preferred. *See* 50 C.F.R. § 600.345(b).

The plaintiffs argue that the SDFMP does not comply with NS–8 because (1) there was no attempt to minimize economic consequences, (2) the descriptions of economic impacts, fishery demographics and the fishing communities are inadequate, (3) the consideration of alternative measures was inadequate, and most importantly, (4) the plan shuts down an entire industry. For example, the plaintiffs assert that they will suffer revenue losses of thirty (30) to one hundred (100) percent, and the elimination of at least two hundred (200) jobs in the processing sector.

The record, however, establishes that the Secretary and the councils considered the importance of the fishery to numerous communities. Indeed, the Secretary concluded that without the measures contained in the SDFMP, data indicates that the fishery will collapse completely within two or three years. *A collapsed fishery will not be economically viable for decades, creating drastically worse economic consequences than the temporary measures contained in the SDFMP.*

Furthermore, the record establishes that the councils and the Secretary considered twelve (12) alternative schemes. The Secretary, councils, and technical committees concluded that the rebuilding schedule ultimately contained in the SDFMP is most likely to rebuild the fishery to a level consistent with producing MSY on a long-term basis. Furthermore, NS–8 specifically states that a fishery management plan does not have to contain an exhaustive listing of all communities that might be affected. *See* 50 C.F.R. § 600.345(c)(3).

The Magnuson–Stevens Act requires the SDFMP to contain management measures which will rebuild this overfished fishery to levels consistent with achieving MSY (in this case SSBmax) within a time period as short as possible but not exceeding ten (10) years. *See* 16 U.S.C. §§ 1853(a)(10), 1854(e)(4)(A), 1802(28)(C), 1802(29). Given this ultimate objective, the SDFMP, *to the extent practicable,* minimizes adverse economic impacts on fishing communities. *See* 16 U.S.C. § 1851(8); 50 C.F.R. § 600.345(a). Finally, the fact that implementation of the SDFMP will result in a closure of the spiny dogfish directed fishery is, in itself, not a violation of NS–8.[21]

### 5. *National Standard Nine (Bycatch)*

■ National Standard Nine ("NS–9") and other provisions of the Magnuson–Stevens Act provide that any fishery management plan must include conservation and management measures that, *to the extent practicable,* minimize fish bycatch. *See* 16 U.S.C. §§ 1851(a)(9), 1853(11); 50 C.F.R. § 600.350. Any proposed conservation and management measures that do not give priority to avoiding the capture of bycatch must be supported by analysis. *See* 50 C.F.R. § 600.350(d). The implementing regulations of the Magnuson–Stevens Act set forth a number of factors relating to bycatch which should be considered when proposing conservation and management measures. *See* 50 C.F.R. § 600.350(d)(3)(i).

The plaintiffs argue that bycatch and discards account for a large portion of spiny dogfish mortality. The plaintiffs argue that the originally proposed rebuilding targets of 200,000 metric tons SSB and a mortality rate of 0.03 are realistically unattainable because of a high discard

---

**21.** The consideration of adverse economic impacts and the closure of the spiny dogfish fishery is discussed at length in relation to the requirements of the Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq. See infra* Parts VI(D) and VI(F) of this opinion.

rate.[22] The administrative record, indeed, confirms that a high level of bycatch plagues the spiny dogfish fishery. It is clear, however, that the Secretary has given reasoned consideration to the issue of bycatch. In response to public comment regarding bycatch, the Secretary noted that a significant portion of bycatch occurs in the directed fishery, because undersized fish are often discarded. *See* Final Rule, 65 Fed.Reg. 1557, 1560 (January 11, 2000). The Secretary has reasoned, therefore, that directed fishery discards will significantly decrease beginning in year two of the rebuilding period, after the closure of the directed fishery. *See id.* Furthermore, as discussed above, data collected by NMFS and relied upon by the Secretary, provide bycatch and discard estimates well below what is projected by the plaintiffs.

Finally, as two members of the NEFMC who supported the SDFMP commented, it is "nonsensical and irresponsible" to move the goalpost because a high discard rate makes it difficult to reach the goal.[23] In this case, *the goalpost cannot be moved.* The Magnuson–Stevens Act requires the rebuilding of an overfished fishery, within a time period as short as possible but not exceeding ten (10) years, to a level consistent with achieving MSY (in this case SSBmax) on a continuing basis.

Nevertheless, it is evident that the Secretary has considered the issues involving bycatch. It was not arbitrary, capricious or a violation of NS–9 or the bycatch provisions of the Magnuson–Stevens Act for the Secretary to implement the SDFMP and the interim final rule. *See* 16 U.S.C. §§ 1851(a)(9), 1853(11); 50 C.F.R. § 600.350.

### D. *Regulatory Flexibility Act*

The Plaintiffs argue that that Secretary's approval of the SDFMP and interim final rule was arbitrary, capricious or otherwise contrary to the law because it violated the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 601 *et seq.* Congress enacted the RFA to encourage administrative agencies to consider the potential impact of nascent federal regulations on small businesses. *See Associated Fisheries*, 127 F.3d at 111. The RFA requires an agency to prepare a Regulatory Flexibility Analysis ("RF–Analysis") which, among other things, must identify the potential economic impact of agency regulation on small entities, and discuss alternatives which might minimize adverse economic consequences.[24] *See* 5 U.S.C. §§ 603, 604; *Associated Fisheries*, 127 F.3d at 111–12.

**22.** Indeed, in response to the issue of bycatch, the councils have recently supported a new fishing mortality target of 0.11. *See* MAFMC Transcript, Administrative Record at 450–57 (March 16, 2000). The councils claim that this new mortality target is consistent with the mortality from bycatch alone. *See id.* However, the record indicates that a rebuilding target mortality of 0.11 does not achieve SSBmax for over thirty (30) years. *See id.*

The Secretary has reasonably anticipated that the level of bycatch will decrease significantly upon the closure of the directed fishery. Once the Secretary reasonably determines that the target mortality of 0.03 is possible to achieve, then the Magnuson–Stevens Act requires this target. It now appears that even if a mortality of 0.03 were achieved, it would take longer than ten (10) years to achieve SSBmax. This fact does not give the councils or the Secretary discre-

tion to increase the target mortality to a level that will not achieve SSBmax for over thirty (30) years. Rebuilding must be achieved within a time period that is as short as possible. *See* 16 U.S.C. § 1854(e)(4).

The record indicates, therefore, that establishing a target mortality of 0.11 would be violative of the Magnuson–Stevens Act. *See* 16 U.S.C. § 1854(e)(4).

**23.** *See* NEFMC Transcript, Administrative Record at 3526, 3536 (November 18, 1999) (statements of members Kurkul and Fordham).

**24.** A "small entity" as defined by the RFA encompasses a variety of small organizations, including small businesses, nonprofit enterprises and small governmental jurisdictions. *See* 5 U.S.C. § 601(6).

An RF–Analysis is required only, (1) when "an agency is required by [law] to publish general notice of proposed rulemaking for any proposed rule," or (2) when "an agency promulgates a final rule ... after being required by [law] to publish a general notice of proposed rulemaking." *See* 5 U.S.C. §§ 603(a), 604(a). The Secretary may incorporate into an RF–Analysis "any data or analysis contained in any other impact statement or analysis required by law." *See Associated Fisheries,* 127 F.3d at 115.

The RFA does not command an agency to take specific substantive measures, but rather, only to give explicit consideration to less onerous options. *See Associated Fisheries,* 127 F.3d at 114. Among other things, a final RF–Analysis must contain "a description of the steps the agency has taken to minimize the significant economic impact on small entities *consistent with the stated objectives of applicable statutes,* including a statement of the factual, policy and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected." *See* 5 U.S.C. § 604(a)(5) (emphasis added).

In this case, the Secretary was required to, and did, prepare an RF–Analysis prior to the final rule which implemented the SDFMP. The record indicates that the Secretary and the councils were and are aware that implementation of the SDFMP, which greatly reduces landings, may result in the "elimination of [spiny dogfish] processing operations for the remaining dogfish processors and the potential loss of approximately two hundred (200) jobs." *See* Final Rule, 65 Fed.Reg. 1557, 1566 (January 11, 2000). The plaintiffs do not argue, therefore, that the Secretary is unaware of the potential devastating consequences to small businesses. Rather, the plaintiffs claim that the Secretary has violated the RFA by failing to adequately consider and describe other significant alternatives and measures to the final rule implementing the SDFMP. *See* 5 U.S.C. § 604(a)(5).

First, the RFA does not require that an RF–Analysis address every alternative, but only that it address significant ones. *See* 5 U.S.C. §§ 603(c), 604(a)(5). Even so, as discussed above, the record indicates that at least twelve (12) alternative rebuilding schedules were considered and rejected by the Secretary and the councils. In short, the alternatives were rejected because they did not meet target fishing mortality levels, did not meet other requirements of the Magnuson–Stevens Act, or did not provide long-term economic benefits greater than those of the proposed action. *See* Final Rule, 65 Fed.Reg. 1557, 1567 (January 11, 2000).

The mandate of the RFA is to minimize significant economic impacts on small entities *consistent with the applicable statute. See* 5 U.S.C. §§ 603, 604. Congress has emphasized that the RFA should *not* be construed to undermine other legislatively mandated goals. *See Associated Fisheries,* 127 F.3d at 113. The intent of the RFA is not to limit regulations having adverse economic impacts on small entities. Rather, "the intent is to have the agency focus special attention on the impacts its proposed actions would have on small entities, to disclose to the public which alternatives it considered, to consider public comments on impacts and alternatives, and to require the agency to state its reasons for not adopting an alternative having less of an adverse impact on small entities." *See Associated Fisheries,* 127 F.3d at 116; *see also* Final Rule, 61 Fed. Reg. 27,710, 27,721 (May 31, 1996).

In this case, the objective of the Magnuson–Stevens Act is clear. The SDFMP must provide for measures which will rebuild the fishery to a level consistent with achieving MSY (in this case SSBmax) within a time period as short as possible but not exceeding ten (10) years. As this Circuit has recognized, what the fishing industry desires is inconsistent with what

the Magnuson–Stevens Act obliges the Secretary to do. *See Associated Fisheries,* 127 F.3d at 117. "Of necessity, given the distressed condition of ... this fishery, *any* alternative consistent with the Secretary's conservation mandate under the Magnuson–Stevens Act will produce economic hardships for the industry." *See id.* (emphasis added).

The RF–Analysis completed by the Secretary meets all of the requirements of the RFA. *See* 5 U.S.C. §§ 603, 604.

### E. *Notice and Comment Requirements*

██ Finally, the plaintiffs argue that the emergency implementation of the interim final rule violated the RFA and the notice requirements of the APA by failing to issue public notice and seek comment. *See* 5 U.S.C. § 553. The notice and comment requirements of the APA, however, do not apply when an agency "for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." *See* 5 U.S.C. § 553(b)(3)(B).

It is true that the "good cause" exception to the notice and comment requirements of the APA have been narrowly construed. *See Tennessee Gas Pipeline Co. v. Federal Energy Regulatory Commission,* 969 F.2d 1141, 1144 (D.C.Cir. 1992). In general, an agency may dispense with notice and comment only "in emergency situations where delay would do real harm." *See Action on Smoking and Health v. Civil Aeronautics Board,* 713 F.2d 795, 800 (D.C.Cir.1983).

Congress, recognizing the distinct possibility of such emergency situations in fishery management, has specifically provided for an exception to the notice and comment requirements in the Magnuson–Stevens Act. *See* 16 U.S.C. § 1855(c); *see also Pacific Coast Federation of Fishermen's Assoc., Inc. v. Secretary of Commerce,* 494 F.Supp. 626, 633–34 (N.D.Cal.1980). The Magnuson–Stevens Act specifically provides that the Secretary may promulgate an emergency regulation or interim measure for one hundred eighty (180) days without public notice and comment.[25] *See* 16 U.S.C. § 1855(c)(3)(B). The implementing regulations specifically provide that "if interim measures are made effective without prior notice and opportunity for comment, they should be reserved for exceptional circumstances." *See* 50 C.F.R. § 600.310(e)(5)(ii).

Indeed, this Circuit has explicitly stated that these provisions of the Magnuson–Stevens Act provide the Secretary with the power to issue emergency regulations with a "minimum of formalities." *See Commonwealth of Massachusetts v. Daley,* 170 F.3d 23, 32 (1st Cir.1999). Such emergency regulations "bypass the ordinary scheme of the Magnuson–Stevens Act." *See id.* at 24.

When the Secretary implemented the interim final rule on May 4, 2000, he had already taken extensive public comment on the SDFMP, which proposed measures needed to reduce the mortality rate to 0.03. The Secretary had already *three times* delayed the effective date of the implementation of the SDFMP so that the councils could agree on quotas and trip limits. May 1, 2000, the start of this year's fishing season, came and went without any agreement by the councils. Had the Secretary failed to implement the interim final rule, the unregulated fishery would have faced a tragic open fishing season.[26]

---

25. The Secretary may extend the interim measure by an additional one hundred eighty (180) days, however, "provided the public has had an opportunity to comment on the emergency regulation or interim measure." *See* 16 U.S.C. § 1855(c)(3)(B).

26. Furthermore, the emergency quota implemented by the Secretary in the interim final rule is significantly less restrictive than what he *could* have, and perhaps *should* have required, according to the projections of the SDFMP and recent data. The interim final rule establishes an emergency quota of ap-

The promulgation of the interim final rule clearly meets the "good cause" standard of the APA and the "exceptional circumstances" standard of the Magnuson–Stevens Act. As such, the Secretary was not required to comply with the notice and comment requirements of the APA prior to the issuance of the interim final rule. For the same reason, the Secretary was not required by the RFA to conduct an additional RF–Analysis on the interim final rule. As discussed above, an RF–Analysis is required only when the Secretary is required to publish general notice for a proposed or final rule. *See* 5 U.S.C. §§ 603, 604.

### F. *Closing the Directed Spiny Dogfish Fishery*

Much of the plaintiffs' argument is based on the fact that the implementation of the SDFMP will likely result in the closure of the spiny dogfish directed fishery for at least the next five years.[27] Indeed, the record indicates that some members of the NEFMC and state agencies are confused about the requirements and priorities of the Magnuson–Stevens Act.

The National Standards and the RFA *must be consistent with the ultimate conservation requirements of the Magnuson–Stevens Act.* Any fishery management plan must, first and foremost, contain measures which prevent overfishing and rebuild overfished stocks. *See* 16 U.S.C. § 1853(a)(1). Where the Secretary has designated a fishery as overfished, measures *must* provide for rebuilding to a level consistent with producing the maximum sustainable yield, or suitable proxy, within a time period as short as possible but not exceeding ten (10) years. *See* 16 U.S.C. §§ 1802(28)(C), 1802(29), 1854(4), 1853(10).

The requirements of the RFA as well as the National Standards pertaining to adverse economic impacts, efficiency, and bycatch, are to be applied *to the extent practicable* given this primary conservation objective.[28] Measures contained in a fishery management plan may well result in the closure of a fishing industry. This terrible and unfortunate consequence, however, was readily anticipated by Congress when it amended the Magnuson–

proximately 4.5 million pounds beginning on May 1, 2000. The SDFMP, however, originally projected that an annual quota of 2.9 million pounds would be needed in order to sustain a fishing mortality rate of 0.03, and in order to achieve SSBmax within ten years. *See* Final Rule, 65 Fed.Reg. 1557, 1558 (January 11, 2000).

27. Plaintiffs' arguments concerning NS–8 and the RFA (and to a lesser extent NS–5 and NS–9), are premised on the potential economic consequences that would result from a closure of the spiny dogfish directed fishery.

28. When Congress amended the Magnuson–Stevens Act in 1996, it specifically recognized that concepts contained in other National Standards should be consistent with the primary conservation goal of the statute. For example, Congress "demote[d] the role of efficiency in fishery management ... by changing National Standard Five from one of promoting efficiency ... to merely considering efficiency." *See* 142 Cong.Rec. S10794, 10814 (September 18, 1996) (statement of Sen. Gorton).

Significantly, Congress recognized that "there is no requirement in the Magnuson–Stevens Act to require fishery management councils to try to minimize the adverse economic impacts of fisheries regulations on fishing communities ... [It is] clear that these *economic considerations are not designed to trump conservation considerations in the process of developing fishery management plans.*" *See* 142 Cong.Rec. S10794, 10825 (September 18, 1996) (statement of Sen. Snowe) (emphasis added).

Even if there were an internal conflict between the overarching conservation mandates of the Magnuson–Stevens Act and another provision, this Circuit has recognized that "the job of the courts and the administrator is to implement the central aim of the statute." *See Commonwealth of Massachusetts v. Daley*, 170 F.3d 23, 30 (1st Cir.1999). In fact, the balancing of any conflicting objectives is primarily for the Secretary; his decision on this issue, and even more so on the exigencies of enforcement, are matters on which he enjoys great latitude. *See id.* at 31.

Stevens Act in 1996.[29]

This Court sympathizes greatly with those individuals involved in the spiny dogfish fishing and processing industry. Nevertheless, this Court concludes that the Secretary implemented the SDFMP and the interim final rule in a reasoned manner, pursuant to statute, and supported by substantial evidence in the record. *See Associated Fisheries,* 127 F.3d at 109. The Secretary examined the pertinent evidence, considered the relevant factors, and articulated a satisfactory explanation for his actions. *See Penobscot Air,* 164 F.3d at 719. The Secretary adequately explained his actions and responded to relevant public comment. *See id.* n. 3. After a thorough and searching inquiry of the administrative record, this Court is satisfied that the Secretary made reasoned decisions founded on a reasoned evaluation of the relevant factors. *See id.* As such, this Court finds that the actions of the Secretary were not arbitrary, capricious or otherwise contrary to law. *See* 5 U.S.C. § 706(2)(A)–(D); *see also Sierra Club,* 976 F.2d at 769.

## VII. *Conclusion*

As a sick person must undergo painful surgery and then convalesce for a short time in order to regain his health, a sick fishery must suffer this drastic procedure and then conserve itself for a short time in order to recover its full vitality.

For the reasons stated above, the plaintiffs' Motion for Summary Judgment is denied, and the defendant's Cross–Motion for Summary Judgment is granted.

SO ORDERED.

---

**29.** Congress recognized that "rebuilt stocks in New England and elsewhere will eventually provide benefits to producers and consumers, but, at the present, efforts to halt overfishing, restore the depleted resource, and conserve habitats will decrease revenues to fishermen *and drive some out of business. The industry will have to sustain some losses in the short term if it is to remain viable in the long term."* *See* 140 Cong.Rec. E964 (May 18, 1994) (extension of remarks by Rep. Hamilton) (emphasis added).