**RECREATIONAL FISHING ALLIANCE, et al.,**
Plaintiffs,

v.

Donald L. EVANS, et al., Defendants.

Civil Action No. 99–2628(RWR).

United States District Court,
District of Columbia.

Sept. 20, 2001.

Cary Robert Wiener, Deorchis, Walker & Corsa, New York City, John J. Guidera, De Orchis & Partners, Union, NJ, for plaintiffs.

Janice M. Schneider, David W. Hoskins, Alison V. Areias, Wildlife & Marine Resources Section, Environment & Natural Resources Division, U.S. Dept. of Justice, Washington, DC, for William M. Daley, Penelope D. Dalton.

Alison V. Areias, Wildlife & Marine Resources Section, Environment & Natural Resources Division, U.S. Dept. of Justice, John J. Farmer, Richard J. Hughes Justice Complex, Trenton, NJ, for Norman Y. Mineta.

### *MEMORANDUM OPINION*

ROBERTS, District Judge.

Plaintiffs, individuals and associations involved in the recreational fishing industry, brought this challenge to the Commerce Secretary's[1] regulations implementing the final 1999 Highly Migratory Species Fishery Management Plan. Both parties have moved for summary judgment. Because the Secretary acted within his authority as to all of the challenged actions, defendants' cross-motion for summary judgment will be granted and plaintiffs' motion for summary judgment will be denied.

---

1. Donald Evans was confirmed as the new Secretary of Commerce and is substituted as defendant in place of William Daley, pursuant to Fed.R.Civ.P. 25(d)(1).

## I. Introduction

Plaintiffs are recreational fishers who depend economically on yellowfin tuna and shark fisheries. (Pls.' Compl. ¶¶ 1–16.) These tuna and shark species are known as Highly Migratory Species ("HMS"). (*Id.* ¶ 17.)[2]

Recreational fishing for HMS is subject to statutory and regulatory regimes, as well as international agreements, designed to protect HMS. (Pls.' Statement of Material Facts ("Pls.' Statement") ¶¶ 1–5, 9–11.) The focus of this litigation is the final 1999 Highly Migratory Species Fishery Management Plan for Atlantic Tunas, Swordfish and Sharks ("HMS FMP"), promulgated by the National Marine Fisheries Service ("NMFS"), pursuant to its authority delegated by the Secretary of Commerce ("Secretary") under the Magnuson–Stevens Fishery Conservation and Management Act ("Magnuson–Stevens Act"), 16 U.S.C. §§ 1801–83 (1994 & West. Supp. 2000).

Plaintiffs claim that two of the HMS FMP's regulations are arbitrary and capricious, including (1) recreational retention limits on yellowfin tuna ("YFT"), *see* 50 C.F.R. § 635.22(d); and (2) recreational retention limits on large coastal, small coastal and pelagic sharks, *see* 50 C.F.R. §§ 635.20(e)(2), 635.22(c). Specifically, plaintiffs claim that each regulation violates certain National Standards set forth in the Magnuson–Stevens Act. *See* 16 U.S.C. §§ 1851(a)(1)-(10).

In addition, plaintiffs claim that the YFT retention limit disadvantages United States fishers relative to fishers from other nations, in violation of 16 U.S.C. § 1854(g)(1)(C). Finally, plaintiffs assert that in promulgating the YFT retention limit, defendants violated the Regulatory Flexibility Act, 5 U.S.C. §§ 601–612 (1994 & West Supp.2000), as amended by the Small Business Regulatory Enforcement and Fairness Act ("SBREFA"), Pub.L. No. 104–121, §§ 241–42, 101 Stat. 857, 864–68 (1996), by failing adequately to evaluate its effects on small business entities.[3]

## II. Legal Framework

### A. The Magnuson–Stevens Act

The purpose of the Magnuson–Stevens Act is to protect HMS in waters extending two hundred (200) miles from the United States coast through conservation and management measures. *See* 16 U.S.C. §§ 1801(a), (b). Congress found that many HMS were "overfished"[4] and that as

---

**2.** HMS are statutorily defined as including "tuna species [and] oceanic sharks ...." 16 U.S.C. § 1802(20) (parenthetical Latin terms omitted).

**3.** Plaintiffs' Complaint also alleges that the HMS FMP violates the Fifth Amendment to the United States Constitution by depriving plaintiffs of liberty and property without due process of law, and violates the separation of powers principle. (Pl.'s Compl. ¶ 82.) However, plaintiffs have not moved for summary judgment on their constitutional allegations.

**4.** Overfished is defined as "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustain-

able yield on a continuing basis." 16 U.S.C. § 1802(29).

A fishery is "(A) one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational and economic characteristics; and (B) any fishing for such stocks." 16 U.S.C. § 1802(13).

Maximum Sustainable Yield ("MSY") is "the largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological and environmental conditions." 50 C.F.R. § 600.310(c)(1)(i). The Code recognizes that "[a]ny MSY values used in determining [optimum yield] will necessarily be estimates, and

a result of "increased fishing pressure" and "the inadequacy of fishery resource conservation and management practices," the survival of HMS "is threatened." 16 U.S.C. § 1801(a)(2). Congress also found that other species, while not technically overfished, were "so substantially reduced in number that they could become similarly threatened." *Id.*

The Magnuson–Stevens Act directs the Secretary to prepare "fishery management plans which will achieve and maintain, on a continuing basis, the optimum yield [5] from each fishery," 16 U.S.C. § 1801(b)(4), including HMS. *See* 16 U.S.C. § 1854(g)(1). That responsibility is delegated to NMFS. *Id.*

A plan issued pursuant to the Magnuson–Stevens Act must be consistent with ten National Standards. *See* 16 U.S.C. § 1851(a). Plaintiffs raise four of these standards in their claims, arguing that each of the 1999 HMS FMP regulations at issue violated the following standards:

(1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

(2) Conservation and management measures shall be based upon the best scientific information available.

(4) Conservation and management measures shall not discriminate between residents of different States. If it becomes

necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

(8) Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

16 U.S.C. §§ 1851(a)(1), (2), (4), (8).

Plaintiffs also challenge the YFT retention limit under another provision of the Magnuson–Stevens Act, which requires that when the Secretary prepares the HMS FMP, the plan should, to the extent practicable, minimize any disadvantage the regulations might place on United States fishers as compared to foreign fishers. *See* 16 U.S.C. § 1854(g)(1)(C) (Secretary shall "evaluate the likely effects, if any, of conservation and management measures on participants in the affected fisheries

---

these will typically be associated with some level of uncertainty. Such estimates must be based on the best scientific information available (see § 600.315) and must incorporate appropriate consideration of risk (see § 600.335). Beyond these requirements, however, Councils have a reasonable degree of latitude in determining which estimates to use and how these estimates are to be expressed." 50 C.F.R. § 600.310(c)(2)(ii).

**5.** Optimum yield is "the amount of fish which—(A) will provide the greatest overall

benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems; (B) is prescribed on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or ecological factor; and (C) in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery." 16 U.S.C. § 1802(28).

and minimize, to the extent practicable, any disadvantage to United States fishermen in relation to foreign competitors").

### B. Atlantic Tunas Convention Act

In addition to the Magnuson–Stevens Act, the Atlantic Tunas Convention Act ("ATCA"), 16 U.S.C. § 971 (1994), provides further authority for the Secretary to promulgate tuna conservation programs. In enacting ATCA, Congress gave the State Department authority to participate in the International Convention for the Conservation of Atlantic Tunas ("Convention"). *See* 16 U.S.C. §§ 971c, d(a). ATCA directs the Secretary to issue and enforce fishery management plans that comport with the Convention's objectives. *See* 16 U.S.C. § 971d.

Under ATCA, the State Department has broad discretion to implement tuna conservation programs, "except that no regulation ... may have the effect of increasing or decreasing any allocation or quota of fish or fishing mortality level to the United States agreed to pursuant to a recommendation of the Commission." 16 U.S.C. §§ 971d(c)(1)(A), 971d(c)(3)(K). The "Commission" is the International Commission for the Conservation of Atlantic Tunas ("ICCAT"). 16 U.S.C. § 971a. ICCAT carries out the Convention's objectives of maintaining the tuna population and makes recommendations for achieving the Convention's tuna conservation goals. (Defs.' Combined Mem. in Opp'n to Pls.' Mot. for Summ. J. and Supp. Cross–Mot. for Summ. J. ("Defs.' Mem.") at 2–3.) Therefore, while the State Department cannot alter the United States YFT quota, pursuant to the Magnuson–Stevens Act and ATCA, it may develop conservation programs (such as retention limits) in conjunction with the fixed YFT quota.

### C. Standard of Review

The Magnuson–Stevens Act provides for judicial review of an HMS FMP under the same standards as those set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706(2)(A)-(D) (1994). *See* 16 U.S.C. § 1855(f). The APA directs that "the reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

■ In reviewing an agency's action to determine whether it was arbitrary and capricious, courts are constrained to review only those facts before the agency at the time of the action. *See Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). "If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Id.* at 744, 105 S.Ct. 1598; *accord Southwest Ctr. for Biological Diversity v. Babbitt,* 215 F.3d 58, 61 (D.C.Cir.2000) (reversing the district court's order directing that the agency collect more evidence to support its position because the district court was empowered to decide the issue presented based solely on the information available to the agency).

■ A court should engage in a searching and careful review of agency action but should not attempt to substitute its own judgment for the judgment of the agency. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Because the agency is expected to have expertise is its

area, a certain degree of deference is due, particularly on issues about which experts disagree. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

Despite this deferential standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). To determine whether the agency has articulated a satisfactory explanation,

> [A court] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies: 'We may not supply a reasoned basis for the agency's action that the agency itself has not given.' ... We will, however, 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'

*Id.* (internal citations omitted). For an agency's decisionmaking to be rational under *Motor Vehicle Mfrs. Ass'n,* the agency "must respond to significant points raised

during the public comment period" and "consider significant alternatives to the course it ultimately chooses." *Allied Local & Regional Mfrs. Caucus v. EPA,* 215 F.3d 61, 80 (D.C.Cir.2000).

Summary judgment is appropriate where "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment must provide the district court with a factual record sufficient to demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This case involves parties' motions for summary judgment as to certain administrative decisions in the 1999 HMS FMP. Specifically, I must determine whether the record supports the contention that 1999 HMS FMP satisfies the substantive requirements set out by the Magnuson–Stevens Act, as well as the Regulatory Flexibility Act.

### III. Substantive Disputes

#### A. Yellowfin Tuna Retention Limits

Plaintiffs challenge the YFT retention limits that provide:

> Three yellowfin tunas per person per day may·be retained. Regardless of the length of a trip, no more than three yellowfin tuna per person may be possessed on board a vessel.

50 C.F.R. § 635.22(d). Plaintiffs argue that this provision is arbitrary and capricious because it violates the Magnuson–Stevens Act's National Standards One, Two, Four and Eight. The defendants, though, have described a sufficiently rational basis to support the need for YFT retention limits.[6]

---

6. Plaintiffs also seek alternative relief in the form of a declaration that the YFT retention

limit must be enforced as a per-day limit, and not a per-trip limit. (Pls.' Mem. Supp.

## 1. Background

In accordance with the Magnuson–Stevens Act, NMFS prepared an HMS FMP which included measures to prevent YFT overfishing and to conserve YFT. *See* 62 Fed.Reg. 45,614–15. In 1997, ICCAT's Standing Committee on Research and Statistics ("SCRS") estimated the 1993 YFT fishing mortality rate to be 92% of the MSY. A.R. Vol. 4, Doc. 79a, at 2–5. In a 1998 report, SCRS recommended that YFT fishing should be reduced, or at least kept at current levels, based on its finding that YFT landings were "close to the MSY level and fishing effort and fishing mortality may be in excess of the levels associated with MSY . . . ." A.R. Vol. 29, Doc. A24, at 23. After holding public hearings, having an extended public comment period, receiving information and advice from the HMS Advisory Panel and receiving public input from recreational fishers that supported the YFT retention limit, NMFS included a recreational YFT retention limit in its proposed rule. (Defs.' Mem. at 12–13 & n.11.) NMFS substantiated this retention limit based on information that YFT were approaching overfished status. (*Id.* at 19–20; Def.'s Reply at 3); A.R. Vol. 8, Doc. 152a, ch. 3, at 134, Table 10, at xxiii; A.R. Vol. 9, Doc. 161, at 29101 cmt. 10; A.R. Vol. 31, D–16, at 7.[7] Even though

YFT may not be overfished at the present time, the Magnuson–Stevens Act was not enacted to protect only overfished species, and NMFS has authority to impose retention limits to *prevent* overfishing. *See* 16 U.S.C. § 1851(a)(1) ("[c]onservation and management measures shall prevent overfishing"). The Final HMS FMP incorporated the proposed YFT retention limit, including the provision that no more than three YFT per person may be retained on board a vessel, regardless of the length of the trip. 50 C.F.R. § 635.22(d).

## 2. Discussion

### a) National Standard One

Plaintiffs contend that the recreational YFT retention limit violates National Standard One by failing to account for "the quality of the recreational YFT fishing experience and its contribution to local, regional, and national economies and food production." (Pls.' Mem. at 20.) Plaintiffs argue that, since YFT are not "overfished," this "means YFT are not being harvested at levels above [MSY]." (*Id.*) Therefore, plaintiffs appear to reason, the retention limit "wrongly reduces [YFT's] yield from optimal levels, thereby failing to achieve the greatest overall benefit to the

Summ. J. ("Pls.' Mem.") at 22–23.) Plaintiffs argue that 50 C.F.R. § 635.22(d) is unclear and that the plain language of the HMS FMP and of the first sentence of the regulation indicate NMFS's intent that the limit be a per-day limit. (*Id.*) However, plaintiffs failed to raise—and thereby put NMFS on notice of—this specific argument during the administrative proceedings concerning the proposed rule (which contained language identical to the final rule, *see* A.R. Vol. 6, Doc. 109, at 3182). *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553–54, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (holding that general objections are insufficient to put an agency on notice and that objecting parties must advance specific comments); *Northside Sanitary Landfill, Inc. v. Thomas*, 849 F.2d

1516, 1519–21 (D.C.Cir.1988). Therefore, plaintiffs may not present this argument for the first time before this Court.

Even if plaintiffs' alternative argument for relief were subject to judicial review, however, plaintiffs have failed to demonstrate that NMFS did not intend exactly what it said in imposing enhanced YFT retention limits by the day *and* by trip. (*See* Defs.' Mem. at 35–36.)

7. Plaintiffs argument that defendants relied primarily on 1993 ICCAT recommendations to substantiate the YFT retention limit (Pls.' Mem. at 12–13), is unsupported by the administrative record.

Nation" and violating National Standard One. (*Id.*)

Plaintiffs have failed to support their argument that NMFS's YFT retention limit does not seek to achieve the optimum yield which will provide "the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities . . . ." 16 U.S.C. § 1802(28)(A). Plaintiffs' argument merely assumes, without providing justification, that because YFT are not being harvested at levels above MSY, the retention limit will reduce the amount harvested below optimum yield levels. Plaintiffs have provided no support for their inference that the full MSY is equal to the optimum yield for YFT. The United States Court of Appeals for the District of Columbia Circuit has held that "an FMP can comply with [National] Standard 1 if there are social, economic or ecological factors that justify the pursuit of a yield less than the maximum sustainable yield." *C & W Fish Co., Inc. v. Fox,* 931 F.2d 1556, 1563 (D.C.Cir.1991). Further, the statute specifically provides that the optimum yield is determined by the MSY in cases of overfished fisheries, *see* 16 U.S.C. § 1802(28), and parties agree that YFT is not an overfished fishery. (Pls.' Mem. at 20; Defs.' Mem. at 13.)

In addition, plaintiffs overlook the fact that National Standard One is meant to prevent overfishing while seeking to achieve the optimum yield. Contrary to plaintiffs' seeming presumption, recreational fishers are not statutorily entitled to harvest the MSY of YFT. Even if the Magnuson–Stevens Act required the HMS FMP to allow fishers to catch the MSY of YFT every year, such a requirement would not necessarily translate to a right vested in the recreational fishing industry to catch the full MSY; rather, it would run to the rights of United States fishers as a whole. Accordingly, the YFT recreational retention limit, 50 C.F.R. § 635.22(d), does not violate National Standard One.

#### b) National Standard Two

Plaintiffs argue that NMFS did not rely on the best scientific information available—namely, the SCRS information—when developing the YFT retention limit. Instead, plaintiffs contend, defendants refused to rely on the SCRS information and relied only on Marine Recreational Fishing Statistics Survey ("MRFSS") data and Large Pelagics Survey ("LPS") data even though they knew this data had flaws. Despite defendants' attempt to remove some of the data flaws, plaintiffs conclude, defendants did not use the best scientific evidence available and therefore violated National Standard Two.

Defendants maintain that the YFT retention limit is based on the best available scientific evidence available at the time the HMS FMP was approved, including the 1998 SCRS Report *and* MRFSS and LPS data. (Defs.' Mem. at 22 (citing A.R. Vol. 8, Doc. 152a, ch. 2, at 8, ch. 3, at 134.)) Contrary to plaintiffs' assertion, defendants relied on the SCRS information, which plaintiffs have acknowledged was the best scientific information available. The 1998 SCRS Report stated that YFT "landings appear to be close to the MSY level and fishing effort and fishing mortality may be in excess of the levels associated with MSY, [and therefore,] it is important to ensure that effective effort does not increase further." A.R. Vol. 29, Doc. A24, at 23. Based on this information, NMFS reasonably concluded that it needed to implement precautionary measures to prevent YFT overfishing.

The SCRS information, however, provides aggregated data on a global scale and does not include data useful to develop management measures for a particular country and fishing sector. Therefore, de-

fendants maintain, NMFS also had to rely on MRFSS and LPS data to develop domestic fishery management measures that are consistent with ICCAT recommendations. Further, it is inconsistent for plaintiffs to argue that MRFSS and LPS data is flawed while acknowledging that the SCRS information is accurate, because the SCRS information used MRFSS and LPS data in compiling its aggregate report. (Defs.' Mem. at 24.) To the extent that plaintiffs argue that the flaws in the MRFSS and LPS data substantiate a National Standard Two violation, NMFS has addressed the data's potential limitations in its responses to public commentary:

> [T]he MRFSS data program is designed to estimate recreational catch and effort over broad areas. While the program admittedly does not capture information on pulse fisheries or rare event fisheries, such as billfish and swordfish, the generated estimates and their proportional standard error estimates give an indication of their statistical validity. The LPS is designed to better capture catch and effort data on HMS. NMFS plans to continue this survey and consider expanding the program to additional geographic areas.

A.R. Vol. 9, Doc. 161, at 2902.

Plaintiffs have not established that despite these data limitations, NMFS did not use the best information available from multiple sources to establish the YFT retention limit. An agency is required only to base its determinations on information available at the time of preparing the HMS FMP or implementing the regulations. *See* 50 C.F.R. § 600.315(b)(2); *Southwest Ctr. for Biological Diversity*, 215 F.3d at 61 (district court must assess the agency's evidence and resolve the parties' dispute, and it cannot "sidestep this responsibility by imposing an obligation upon the Secretary to find better data").

NMFS established the YFT retention limit to prevent YFT from becoming overfished. (Def.'s Mem. at 23.) NMFS may use the available information on recreational YFT fisheries to create the conservation-based regulations. *See* 50 C.F.R. § 600.315(b) ("The fact that scientific information concerning a fishery is incomplete does not prevent the preparation and implementation of an FMP."); *Massachusetts v. Daley*, 170 F.3d 23, 30 (1st Cir.1999) (NMFS may regulate species even if it lacks complete information); *A.M.L. Int'l, Inc. v. Daley*, 107 F.Supp.2d 90, 101 (D.Mass. 2000) ("The fact that scientific information is incomplete, however, does not prevent the implementation of a fishery management plan."); *Parravano v. Babbitt*, 837 F.Supp. 1034, 1046 (N.D.Cal.1993) ("By requiring that decisions be based on the best scientific information available, the [Magnuson–Stevens] Act acknowledges that such information may not be exact or totally complete."), *aff'd*, 70 F.3d 539 (9th Cir. 1995), *cert. denied*, 518 U.S. 1016, 116 S.Ct. 2546, 135 L.Ed.2d 1066 (1996); *National Fisheries Inst. v. Mosbacher*, 732 F.Supp. 210, 220 (D.D.C.1990) ("[T]he Court will not construe the Magnuson[-Stevens] Act to tie the Secretary's hands and prevent him from conserving a given species of fish whenever its very nature prevents the collection of complete scientific information."). Accordingly, the YFT recreational retention limit, 50 C.F.R. § 635.22(d), does not violate National Standard Two.

### c) National Standard Four

Plaintiffs argue that the YFT retention limit "is an allocation of fishing privileges [among United States fishers] that is not reasonably calculated to promote conservation" as National Standard Four requires. (Pls.' Mem. at 9.) Plaintiffs contend that this regulation will have only a "minimal ecological effect," and, therefore, does not promote conservation or have the requisite

50% likelihood of attaining a target fishing mortality rate required to rebuild the relevant fishery. (*Id.* at 9–10 (citing *NRDC v. Daley,* 209 F.3d 747, 754 (D.C.Cir.2000)).) In addition, because 79% of trips have at least three people aboard, and 94.9% of trips landing one YFT end up landing nine YFT or less, plaintiffs argue that the retention limit "will have no impact on almost 95 percent of fishing trips" and therefore "is not reasonably calculated to promote conservation." (*Id.* at 11.) While the HMS FMP states that the limit is necessary to prevent recreational YFT fishing from expanding, plaintiffs contend that there is no evidence that this particular recreational fishery is expanding.

Defendants argue that the YFT retention limit is consistent with National Standard Four, because "the YFT retention limit in conjunction with other management measures is more than reasonably calculated to promote conservation through preventing overfishing." (Defs.' Mem. at 27.) In addition, defendants argue that plaintiffs' reliance on *NRDC v. Daley*'s 50% probability rule is misplaced, because that rule applies to inquiries under National Standard One. *See* 209 F.3d at 754 (holding that National Standard One requires that fishing quotas have a 50% likelihood of attaining a target fishing mortality rate required to rebuild the relevant overfished fishery). Further, the probability rule cannot apply to YFT since the YFT fishery is not designated as overfished—and, therefore, does not have a rebuilding plan and target fishing mortality rate—as is required before the 50% probability rule can apply.

Plaintiffs have not provided sufficient evidence that the YFT retention limit is not fair and equitable to all United States fishers, reasonably calculated to promote conservation, or carried out such that no particular individual, corporation, or other entity acquires an excessive share of such privileges. In addition, plaintiffs have not supported their contention that a National Standard Four analysis incorporates *NRDC v. Daley*'s 50% probability rule. Even if the rule could apply in this National Standard Four analysis, however, defendants have not shown that the YFT retention limit—as a regulation of a species that is *not* overfished—would be subject to, or violate, this 50% probability rule. Accordingly, the YFT retention limit does not violate National Standard Four.

### d) National Standard Eight

Plaintiffs argue that the YFT retention limit is inconsistent with National Standard Eight for two main reasons. First, plaintiffs allege that the HMS FMP identified the regulation's potential economic impacts on recreational fishers, but failed to analyze or quantify the impacts. Instead, plaintiffs maintain, NMFS proposed to fabricate the data. Second, plaintiffs allege that NMFS erroneously concluded that the YFT retention limit would have minimal economic impacts on recreational fishers. Instead, plaintiffs say, significant social and economic impacts can be expected as a result of the YFT retention limit.[8]

Plaintiffs also argue that the YFT retention limit does not achieve significant conservation benefits, and the economic costs

---

**8.** Plaintiffs also allege that NMFS could not have analyzed the economic impacts on recreational fishers, because NMFS has failed to define an appropriate universe of recreational fishers. Defendants counter that NMFS did define an appropriate universe of affected fishers when it conducted its analyses. As defendants correctly point out, however, the Regulatory Flexibility Act—and not National Standard Eight—imposes this requirement. Therefore, I will address plaintiffs' universe identification argument when discussing the Regulatory Flexibility Act.

are not justified under National Standard Eight's requirement that defendants must, "to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8). Instead, plaintiffs argue, taking *no* action would achieve conservation benefits similar to those the YFT retention limits would achieve, while eliminating any economic impact on the recreational fishing communities.

Defendants refute plaintiffs' allegations. First, NMFS did analyze the YFT retention limit's potential social and economic effects on various fishing communities, including recreational fishers. *See* A.R. Vol. 8, Doc. 152a, ch. 2, at 36–37, ch. 3, at 134–36; A.R. Vol. 9, Doc. 152b, ch. 7, at 1–9, 13, ch. 9, at 1–6, 24–27, 33–38. Contrary to plaintiffs' allegations, NMFS did not propose to fabricate data to address what were potential gaps in fishing community profiles. Rather, consistent with National Standard Eight, NMFS appears to have used the best evidence available at the time it prepared the HMS FMP to conduct its fishing community analyses. Moreover, plaintiffs' claim that "NMFS admitted that it had not documented the economic value of recreational fisheries" was a mischaracterization of a preliminary HMS FMP draft. Again, NMFS appears to have relied upon the best recreational fishery data available at the time, as the Magnuson–Stevens Act requires. *See* A.R. Vol. 7, Doc. 145, at 1.

Second, whether NMFS's prediction that the YFT retention limit would not have a significant economic impact on recreational fishers in the end is correct or not, it was not arbitrary or unreasonable. NMFS commissioned and assessed the results of a five-state impact study of twelve defined fishing communities. A.R. Vol. 9, Doc. 152b, ch. 9, at 135. NMFS also considered public comments in undertaking its analyses, including comparisons to the decrease in recreational bluefin tuna boat trips following earlier enacted bluefin tuna retention limits. *See* A.R. Vol. 8, Doc. 152a, ch. 3, at 135. NMFS concluded, however, that the YFT retention limit would not significantly affect the revenues of recreational fishers conducting similar trips for YFT, and that the bluefin tuna comparison was not accurate.

Finally, as to the choice between implementing the YFT retention limit and taking no action, defendants argue that, contrary to plaintiffs' claim, these two alternatives do not achieve similar conservation outcomes. NMFS has determined, based on its analyses, that the YFT retention limit has conservation benefits which a "no action" alternative does not have, such as to prevent YFT overfishing.

■ While economic effects must be taken into account, such effects were not meant to trump the real purpose of the Magnuson–Stevens Act, which is to preserve and protect United States fisheries. NMFS must minimize adverse impacts on fishing communities only "to the extent practicable." 16 U.S.C. § 1851(a)(8). Plaintiffs have not provided sufficient evidence from the record to support their claim that the YFT retention limit will fail to minimize adverse economic impacts on the recreational fishing community to the extent practicable. NMFS has demonstrated that it implemented the YFT retention limit to preserve the YFT fishery. The YFT retention limit does not violate National Standard Eight.

### e) International Parity

Plaintiffs argue that NMFS violated the Magnuson–Stevens Act's international parity requirement, 16 U.S.C. § 1854(g)(1)(C), because the YFT retention limit will disadvantage U.S. fishers, and because NMFS

knew of this disadvantage before it enacted this regulation. (Pls.' Mem. at 22.) The Magnuson–Stevens Act requires the Secretary to "evaluate the likely effects, if any, of conservation and management measures on participants in the affected fisheries and minimize, to the extent practicable, any disadvantage to United States fishermen in relation to foreign competitors." 16 U.S.C. § 1854(g)(1)(C). In a four-sentence argument, plaintiffs' summary judgment motion claims that the YFT retention limit "prejudices U.S. fishermen internationally" and, therefore, the regulation "is arbitrary, capricious, not in accordance with law, and must be set aside." (Pls.' Mem. at 22.)

 No facts in the record support plaintiffs' conclusory allegation. As defendants point out, NMFS has not even imposed a domestic YFT quota, and there is no international ICCAT YFT quota. (Defs.' Mem. at 34.) Plaintiffs have shown no evidence that the Secretary failed to evaluate the likely effects, if any, on participants in the affected fisheries, or failed to minimize any disadvantage to plaintiffs in relation to foreign competitors. "Merely because [certain species] are also harvested beyond [United States waters] is no reason why the Secretary should not regulate them within the bounds of his authority under the [Magnuson–Stevens] Act. When Congress passed the Magnuson Act it was well aware of the existence of international fishery management agreements, especially ... the International Convention for the Conservation of Atlantic Tunas [ICCAT]." *National Fisheries Inst. v. Mosbacher*, 732 F.Supp. at 221, *cited in Southern Offshore Fishing Ass'n v. Daley*, 995 F.Supp. 1411, 1428 (M.D.Fla.1998) (Congress did not intend the Secretary "to suspend his conservation and management obligations whenever fish stocks become lethally subject to both foreign and domes-

tic harvest"). The YFT retention limit does not violate section 1854(g)(1)(C) of the Magnuson–Stevens Act.

**f) The Regulatory Flexibility Act**

In a two-sentence paragraph (*see* Pls.' Mem. at 17), plaintiffs argue that the YFT retention limit violates the RFA, as amended by the SBREFA, which directs agencies to evaluate the effect that new regulations will have on small business entities. *See* 5 U.S.C. §§ 601–12. Plaintiffs claim that the Final Regulatory Flexibility Analysis ("FRFA") included in the HMS FMP does not mention recreational fisheries or include the YFT retention limit's economic impacts. In addition, plaintiffs claim that NMFS could not have analyzed the economic impacts on recreational fishers, because NMFS has failed to define an appropriate universe of recreational fishers.

When an agency promulgates a final rule, it must perform an FRFA, which must contain:

(1) a succinct statement of the need for, and objectives of, the rule;

(2) a summary of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a summary of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments;

(3) a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available;

(4) a description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record; and

(5) a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

5 U.S.C. § 604.

The Regulatory Flexibility Act's requirements "do not alter in any manner standards otherwise applicable by law to agency action." 5 U.S.C. § 606. The standard of review is the same as that under the APA—a court reviews the FRFA for arbitrary and capricious action. 5 U.S.C. § 611(a)(2). A reviewing court may remand a rule to the agency for failure to comply with the Regulatory Flexibility Act. 5 U.S.C. § 611(a)(4)(A).[9]

The record shows that NMFS prepared an FRFA for the YFT retention limit. *See* A.R. Vol. 8, Doc. 152a, ch. 2, at 16, 36–37, ch. 3, at 134–36; A.R. Vol. 9, Doc. 152b, ch. 7, at 1–9, 13, ch. 9, at 1–6, 24–27, 33–38. In addition, contrary to plaintiffs' argument, NMFS identified the relevant universe of fishers who depend on revenue from YFT based on what NMFS said, without contradiction, was the best evidence available. *See* A.R. Vol. 8, Doc. 152a, ch. 2, at 16 (defining the relevant universe as the fishers having permits to participate in the Atlantic tuna fishery).

■ The Regulatory Flexibility Act states that "the term 'small business' has the same meaning as the term 'small business concern' under section 3 of the Small

Business Act ...." 5 U.S.C. § 601(3). The relevant section of the Small Business Act defines "small business concern" as "one which is independently owned and operated and which is not dominant in its field of operation ...." 15 U.S.C. § 632(a)(1). The agency "may specify detailed definitions or standards by which a business concern may be determined to be a small business concern for the purposes of this chapter or any other Act." 15 U.S.C. § 632(a)(2)(A). NMFS thus has broad discretion in defining the relevant "small business entities" for purposes of the Magnuson–Stevens Act. Plaintiffs have not shown that, under this standard and based on the best data NMFS had available at the time, defendants improperly defined the relevant universe for purposes of the Regulatory Flexibility Act. Thus, plaintiffs have failed to demonstrate that the final HMS FMP violates the Regulatory Flexibility Act.

**B. Shark Retention Limits**

NMFS also issued regulations that imposed retention limits on recreationally-fished sharks (collectively, "shark retention limits"). These regulations provide:

One shark from either the large coastal, small coastal or pelagic group may be retained per vessel per trip, subject to the size limits described in § 635.20(e), and, in addition, one Atlantic sharpnose shark may be retained per person per trip. Regardless of the length of a trip, no more than one Atlantic sharpnose shark per person may be possessed on board a vessel. No prohibited sharks listed in Table 1(d) of Appendix A to this part may be retained.

50 C.F.R. § 635.22(c).[10] Section 635.20(e) provides in relevant part:

**9.** The Regulatory Flexibility Act provides for judicial review of an agency's compliance with the FRFA requirements. *See* 5 U.S.C.

§§ 611(a)(1), (2); *Allied Local & Regional Mfrs. Caucus*, 215 F.3d at 78–79.

**10.** The list of prohibited sharks in Table 1(d) of Appendix A includes the species "Atlantic

All sharks landed under the recreational retention limits specified at § 635.22(c) must have the head, tail, and fins attached and be at least 54 inches (137 cm), FL, except that the minimum size limit does not apply for Atlantic sharpnose sharks.

50 C.F.R. § 635.20(e)(2). Plaintiffs argue that these provisions are arbitrary and capricious because they violate the Magnuson–Stevens Act's National Standards One, Two, Four and Eight. As they did with the YFT retention limit, the defendants have described a sufficiently rational basis to support the shark retention limits.

## 1. Background

NMFS has determined that, from the time its first final FMP for Atlantic Sharks was published in April 1993, large coastal sharks have been overfished and small coastal sharks have been fully fished. (Defs.' Mem. at 8–9); A.R. Vol. 4, ch. 3, at 79; A.R. Vol. 8, Doc. 152a, ch. 2, at 76. NMFS maintains that the status of pelagic sharks is currently unknown because the 1993 FMP for Atlantic Sharks did not estimate this shark group's MSY, which is necessary for determining whether a certain species is overfished or approaching overfished status. (Defs.' Mem. at 8.) NMFS issued a final rule in April 1997 that lowered recreation retention limits for Atlantic sharks as an interim conservation measure to achieve a 50% reduction in fishing mortality while developing a long-term rebuilding schedule. (*Id.* at 10); 62 Fed.Reg. 16,648, 16652–53; A.R. Vol. 31, E113, Pt. 4. In addition, NMFS was required to implement an FMP to end large coastal sharks' overfished status, *see* 16 U.S.C. §§ 1854(c)(1), (c)(2), (c)(4)(B), (c)(6), (e)(3), and to conserve and prevent over-

fishing of pelagic and small coastal sharks. *See* 16 U.S.C. § 1853(a)(1)(A).

## 2. Discussion

### a) National Standard One

Plaintiffs argue that the shark retention limit "wrongly reduces sharks' yield from optimal levels, thereby failing to achieve the greatest overall benefit to the Nation." (Pls.' Mem. at 26.) Specifically, they contend, the "recreational shark retention limit fails National Standard 1 because the HMS FMP ignores the quality of the recreational shark fishing experience and its contribution to local, regional, and national economies and food production." (*Id.*)

■ Plaintiffs have not substantiated their contention that the shark retention limits will prevent them from "achieving, on a continuing basis, the optimum yield from each fishery" over the long run. 16 U.S.C. § 1851(a)(1); *see also* 50 C.F.R. § 600.310(f)(1)(ii) ("In national standard 1, ... 'achieving, on a continuing basis, the [optimum yield] from each fishery' means producing, from each fishery, a long-term series of catches such that the average catch is equal to the average [optimum yield]."). First, plaintiffs overlook the fact that large coastal sharks are an overfished species and, therefore, NMFS is statutorily required to set out a plan that stops overfishing and rebuilds the stock of fish as quickly as possible. *See* 16 U.S.C. § 1854(e)(4)(A)(i). Based on substantial, ongoing large coastal shark recreational harvest data, NMFS determined that the current shark retention limits enacted in 50 C.F.R. § 635.22(c) and 50 C.F.R. § 635.20(e) were necessary to rebuild the large coastal shark fishery. (Defs.' Mem.

angel, Basking, Bigeye sand tiger, Bigeye sixgill, Bigeye thresher, Bignose, Caribbean reef, Caribbean sharpnose, Dusky, Galapagos, Longfin mako, Narrowtooth, Night, Sand ti-

ger, Sevengill, Sixgill, Smalltail, Whale, and White." 50 C.F.R. § 635, Table 1(d), App. A (Latin terms omitted).

at 37–39); A.R. Vol. 8, Doc. 152a, ch. 2, at 54, 58, 60, 64, 76, 78, ch. 3, at 160–65; A.R. Vol. 35, E50, at 30. Plaintiffs have not shown that NMFS's conclusion was arbitrary or capricious.

Second, plaintiffs have not addressed National Standard One's requirement that "[c]onservation and management measures shall prevent overfishing . . . ." 16 U.S.C. § 1851(a)(1). Again, the Magnuson–Stevens Act does not purport to protect only overfished species. Thus, even though pelagic and small coastal sharks are not overfished at the present time, this does not mean that the shark retention limits applicable to these species are improper. The record shows that NMFS has cause to be concerned that pelagic and small coastal sharks may become overfished as fishers shift their efforts away from harvesting other already-designated overfished shark species. *See* A.R. Vol. 8, Doc. 152a, ch. 3, at 161–62.

Plaintiffs have not pointed to any record evidence that the HMS FMP will fail to achieve optimum yield on a continuing basis over the long run or achieve the greatest overall benefit to the Nation. In addition, plaintiffs have not explained what they mean by a "quality" recreational fishing experience or supported their argument that the HMS FMP is required to address such an activity.[11]

NMFS has justified the shark retention limits to end overfishing of large coastal sharks and to prevent overfishing of small coastal and pelagic sharks, as National Standard One requires. Accordingly, the shark retention limits do not violate National Standard One.

**b) National Standard Two**

Plaintiffs argue that NMFS did not base its shark retention limits on the best information available. Specifically, plaintiffs contend, this information shows that pelagic sharks and small coastal sharks are not overfished, and that the small coastal shark regulation is based on outdated data that is at least ten years old. (Pls.' Mem. at 25–26.)

Defendants argue that the shark retention limits are based on the best scientific evidence for the relevant shark fisheries that was available at the time the final HMS FMP was approved. (Defs.' Mem. at 39); A.R. Vol. 8, Doc. 152a, ch. 2, at 76, ch. 3, at 160–62; A.R. Vol. 34, E32, A.R. Vol. 35, E50. Although plaintiffs contend that NMFS relied on outdated data, plaintiffs have not shown that any other, more recent data was available at the time defendants prepared the HMS FMP.

As was true with the YFT retention limit, plaintiffs have not shown that NMFS failed to use the best information available to establish and implement the shark retention limits. *See Southwest Ctr. for Biological Diversity*, 215 F.3d at 61; *see also* 50 C.F.R. § 600.315(b); *Massachusetts v. Daley*, 170 F.3d at 30; *A.M.L. Int'l, Inc. v. Daley*, 2000 WL 1051935, at *9; *Parravano v. Babbitt*, 837 F.Supp. at 1046; *National Fisheries Inst. v. Mosbacher*, 732 F.Supp. at 220. Accordingly, the shark retention limits do not violate National Standard Two.

**c) National Standard Four**

Plaintiffs argue that the shark retention limits violate National Standard Four for the same reasons as do the YFT retention

---

**11.** Even if plaintiffs adequately supported their fishing experience argument, however, defendants point out that the retention limits still allow recreational fishers to enjoy a "quality fishing experience," because fishers can "catch and release" the sharks "without lethal take of the animal." (Defs.' Mem. at 38–39 & n.30); A.R. Vol. 8, Doc. 152a, ch. 3, at 160; A.R. Vol. 9, Doc. 152b, ch. 9, at 70, 76.

limits—namely, that the limits are "not reasonably calculated to promote conservation" as National Standard Four requires. (Pls.' Mem. at 9.) Plaintiffs contend that the shark limits "will have a *minimal* impact on stock rebuilding" and, therefore, do "not satisfy the requirement that a management measure must be at least 50 percent certain of achieving a conservation goal." (*Id.* at 25.)

Defendants argue that the shark retention limits are "reasonably calculated to promote conservation," consistent with National Standard Four, because "the limits will reduce the harvest of [large coastal sharks] to levels necessary to rebuild the overfished fishery, and will prevent overfishing in the pelagic and fully fished [small coastal shark] fisheries." (Defs.' Mem. at 40); A.R. Vol. 8, Doc. 152a, ch. 3, at 161. In addition, defendants argue that plaintiffs' reliance on *NRDC v. Daley*'s 50% probability rule is misplaced here (as it was with the YFT retention limit arguments) because that rule applies to inquiries under National Standard One. *See* 209 F.3d at 754. Even if the probability rule did apply to a National Standard Four analysis, defendants maintain, the shark retention limits have a 50% likelihood of rebuilding the large coastal shark fishery to its target level. (Defs.' Mem. at 40 (citing A.R. Vol. 8, Doc. 152a, ch. 3, at 288).) [12]

■ As was true with the YFT retention limit, plaintiffs have not provided sufficient evidence that the shark retention limits are not fair and equitable to all United States fishers, reasonably calculated to promote conservation, or carried out such that no particular individual, corporation, or other entity acquires an excessive share of such privileges. Similarly, plaintiffs have not supported their contention that a National Standard Four analysis incorporates *NRDC v. Daley*'s 50% probability rule. Even if the rule could apply in this analysis, however, defendants have not shown that the shark retention limits would violate this 50% probability rule. Accordingly, the shark retention limits do not violate National Standard Four.

### d) National Standard Eight

Plaintiffs argue that because NMFS has very little economic data on the recreational shark fishery, and because the shark retention limits will have a significant impact upon many communities in ways that the HMS FMP failed to analyze, defendants have failed to ensure that the shark retention limits, "to the extent practicable, minimize adverse economic impacts on such communities," as National Standard Eight requires. 16 U.S.C. § 1851(a)(8).

Defendants argue that NMFS acknowledged that the large shark retention limits could have substantial social impacts for nearshore anglers, including a decline in the anglers' willingness to pay for charter or headboat trips. *See* A.R. Vol. 8, Doc. 152a, ch. 3, at 163. However, NMFS also found that over seventy percent of these anglers still would go on recreational trips, because they release their catch and would be unaffected by the retention limits. *Id.* Importantly, NMFS found that sixty-three percent of all shark recreational trips would be unaffected by a reduction in the retention limit to one shark per trip. *Id.* at 164. In addition, these data showed that anglers who spent $197 per shark fishing trip were willing to spend $105 more per trip rather than stop shark fishing altogether. *Id.* Based on this data,

---

**12.** As was the case with YFT, the 50% probability rule cannot apply to pelagic or small coastal sharks, because those fisheries are not designated as overfished and, therefore, do not have a rebuilding plan and target fishing mortality rate.

NMFS reasonably concluded that the shark retention limits would not significantly affect large coastal shark or small coastal shark recreational fishing communities.

NMFS also acknowledged that the shark retention limits may significantly affect recreational pelagic shark fisheries, because certain pelagic shark tournaments are based upon the number of pelagic sharks caught. *Id.* In implementing the retention limits, however, NMFS balanced this potential adverse social impact against the potential for rebuilding shark fisheries and determined that the latter outweighed the former. Specifically, NMFS determined that by rebuilding shark stocks, the retention limits would not only improve conservation but would increase potential revenue because "more and larger sharks could be caught in increasingly shorter time." (Defs.' Mem. at 41 (citing A.R. Vol. 8, Doc. 152a, ch. 3, at 164).)

■ Defendants have provided substantial evidence that NMFS considered and analyzed the shark retention limits' potential impacts upon recreational fishers and determined that these regulations will have minimal adverse impacts upon the recreational fishing community. Accordingly, NMFS has minimized adverse impacts to the extent practicable, and the shark retention limits do not violate National Standard Eight.

## IV. Conclusion

Based on the evidence in the administrative record, the YFT retention limit and the pelagic, large coastal and small coastal shark retention limits are consistent with the Magnuson–Stevens Act, 16 U.S.C. §§ 1851(a)(1), (2), (4), (8), 1854(g)(1)(C). The Secretary duly considered plaintiffs' arguments and comments and acted within his discretion when he promulgated these final rules. Further, the YFT retention limit is consistent with the Regulatory Flexibility Act, 5 U.S.C. § 604.

Accordingly, defendants' cross-motion for summary judgment is granted in its entirety, and plaintiffs' motion for summary judgment is denied in its entirety.